EAGLE RUN SQUARE II, L.L.C., A NEBRASKA LIMITED LIABILITY COMPANY, APPELLEE, V. LAMAR'S DONUTS INTERNATIONAL, INC., A NEBRASKA CORPORATION, APPELLEE, AND JACK L. IRWIN, APPELLANT.
740 N.W.2d 43

Filed October 2, 2007.   No. A-05-1038.

Jerrold L. Strasheim, of Baird Holm, L.L.P., for appellant.

James E. Lang and Kathleen M. Foster, of Laughlin, Peterson & Lang, for appellee Eagle Run Square II, L.L.C.

INBODY, Chief Judge, and CARLSON and MOORE, Judges.

CARLSON, Judge.

## INTRODUCTION

Eagle Run Square II, L.L.C. (Eagle Run), a Nebraska limited liability company, brought an action in the district court for Douglas County to recover on a personal guaranty signed by Jack L. Irwin. The trial court found that the guaranty was ambiguous and allowed the jury to hear extrinsic evidence to

determine the meaning of the guaranty. The jury subsequently determined that Irwin was liable to Eagle Run on the guaranty in the amount of $95,032.78. On appeal, Irwin contends that among other errors, the trial court erred in finding that the guaranty was ambiguous. For the reasons stated below, we reverse, and remand with directions.

## BACKGROUND

On November 16, 1999, Eagle Run and Lamar's Donuts International, Inc. (Lamar's), entered into a written lease whereby Eagle Run leased property in a shopping center near 129th Street and Maple Road in Omaha, Nebraska, to Lamar's for a retail doughnut store. The lease required Lamar's to make monthly rental payments as well as payments for other charges. The lease had a guaranty agreement attached to it.

The guaranty at issue was executed by Irwin as guarantor on October 11, 1999. Just below the title of the one-page document, before the text begins, the document reads, "TO: EAGLE RUN SQUARE II L.L.C." and, on the same line, "TENANT: LAMAR'S DONUTS INTERNATIONAL, INC." The first paragraph of the typed text reads as follows:

> For the purpose of inducing *M & M Property Partners, (herein called "Owner")* to enter into a Lease, dated September ____, 1999, with the tenant named above (herein called "Tenant"), the undersigned (herein called "Guarantor" whether one or more), jointly and severally, unconditionally guaranty the prompt and full payment of all rent to be paid by the Tenant, Paragraph # 3, and the performance by the Tenant of all the terms, conditions, covenants and agreements of the Lease irrespective of any invalidity or unenforceability of any provision thereof or the security therefore [sic].

(Emphasis supplied.) On the executed copy, "September" is crossed out and "Oct" is handwritten in above it, along with "11th" in the space for the day. The guaranty sets forth other rights and obligations of the property owner and lease guarantor, and the final paragraph states that the guaranty "shall inure to the benefit of Owner." The guarantor is not named in the

typed text of the document. At the bottom of the document, October 11, 1999, is filled in as the date the guaranty was executed, and it is signed by Irwin.

On March 26, 2002, Eagle Run initiated a lawsuit against Lamar's and Irwin. The petition alleged that Lamar's had failed and refused to pay rental and other charges due under the November 16, 1999, lease for the months of November 2000 through March 2002. The petition further alleged that Irwin executed a lease guaranty, attached to the lease, in which Irwin unconditionally guaranteed the payment of all rental and other charges due by Lamar's to Eagle Run under the lease and the performance by Lamar's of all the lease's terms, conditions, covenants, and agreements. The petition alleged that demand had been made upon Irwin under his personal guaranty for the payment of such sums, but that such payment had not been made.

On April 23, 2003, Irwin filed a motion for summary judgment alleging that the guaranty signed by Irwin on which Eagle Run based its cause of action against him does not inure to the benefit of Eagle Run or apply to the November 16, 1999, lease as claimed by Eagle Run, but, rather, by its own terms, inures to the benefit of M & M Property Partners and applies to an October 11, 1999, lease. The trial court ultimately overruled Irwin's motion on January 12, 2004.

On June 5, 2003, Eagle Run filed a motion for summary judgment against Lamar's. On April 12, 2004, the trial court granted Eagle Run's motion and entered judgment against Lamar's in the amount of $84,084.10.

On March 3, 2005, Eagle Run filed an amended complaint against Lamar's and Irwin, restating the allegations made in the initial petition but alleging that Lamar's had failed and refused to pay rent and other charges from November 2000 through the date of filing.

On April 26, 2005, Eagle Run filed a second amended complaint, the operative complaint in this case, against Irwin only. The second amended complaint alleged that Lamar's was in default under the lease for failing to make rent payments as well as other payments due under the lease from November 2000 through the date of filing. It further alleged that judgment had been entered in favor of Eagle Run and against Lamar's

in the amount of $84,084.10, that additional amounts had become due and owing after the judgment was entered, and that no sums had been paid by Lamar's. The second amended complaint alleged that Irwin was liable for the default in lease payments and other charges by Lamar's pursuant to the lease guaranty executed by Irwin and attached to the lease, that demand for payment had been made, and that no payments had been made. Eagle Run prayed for judgment against Irwin in the amount of $95,032.78.

A jury trial was held on August 1 through 3, 2005. Prior to the beginning of trial, the court addressed a motion in limine that Irwin had filed on February 7 which asked the court to prohibit any extrinsic evidence in regard to the guaranty. Irwin argued that the key terms of the guaranty were not ambiguous terms and that thus, evidence of the intention of the parties in signing the guaranty was irrelevant. The trial court overruled Irwin's motion in limine.

During the trial, Eagle Run presented evidence to explain the parties' intent in regard to the guaranty. At the end of Eagle Run's evidence, Irwin made a motion for directed verdict, arguing several grounds, one of which was that the terms in the guaranty were not ambiguous. Irwin's motion for directed verdict was overruled. At the end of all the evidence, Irwin renewed his motion for directed verdict, which was overruled. Irwin also asked the court to put on the record its rulings as a matter of law in regard to whether the guaranty and lease were ambiguous. The trial court stated that it found that the guaranty was ambiguous and that the lease was unambiguous.

The jury found that Irwin guaranteed the obligations of Lamar's under the lease between Eagle Run and Lamar's, and it rendered a verdict in favor of Eagle Run in the amount of $95,032.78. The trial court entered judgment on the verdict. The trial court also awarded Eagle Run prejudgment interest in the amount of $13,331.20.

## ASSIGNMENTS OF ERROR

Irwin assigns that the trial court erred in (1) finding that the guaranty was ambiguous, (2) concluding that the guaranty and the lease should be considered and interpreted together,

(3) overruling relevance objections to "evidence concerning the wrong [l]ease," (4) overruling Irwin's motions for directed verdict, (5) finding that there was sufficient competent evidence to establish that the guaranty was enforceable by Eagle Run and covered the lease between Eagle Run and Lamar's, (6) giving certain instructions to the jury and refusing to give other instructions requested by Irwin, and (7) awarding prejudgment interest to Eagle Run.

## STANDARD OF REVIEW

■ The meaning of a contract and whether a contract is ambiguous are questions of law. *Kluver v. Deaver*, 271 Neb. 595, 714 N.W.2d 1 (2006); *Gary's Implement v. Bridgeport Tractor Parts*, 270 Neb. 286, 702 N.W.2d 355 (2005).

■ On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.*

## ANALYSIS

■ Irwin's assignments of error include the trial court's finding that the guaranty was ambiguous. A court interpreting a contract must first determine as a matter of law whether the contract is ambiguous. *Kluver v. Deaver, supra.* See *Hillabrand v. American Fam. Mut. Ins. Co.*, 271 Neb. 585, 713 N.W.2d 494 (2006). A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *Kluver v. Deaver, supra; Gary's Implement v. Bridgeport Tractor Parts, supra.* A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Kluver v. Deaver, supra; Hillabrand v. American Fam. Mut. Ins. Co., supra.*

■ A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000); *Estate of Stine v. Chambanco, Inc.*, 251 Neb. 867, 560

N.W.2d 424 (1997). If a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract. *Ruble v. Reich, supra*; *Plambeck v. Union Pacific RR. Co.*, 244 Neb. 780, 509 N.W.2d 17 (1993). In contrast, the meaning of an unambiguous contract is a question of law. *Ruble v. Reich, supra*; *Kropp v. Grand Island Pub. Sch. Dist. No. 2*, 246 Neb. 138, 517 N.W.2d 113 (1994). When a contract is unambiguous, the intentions of the parties must be determined from the contract itself. *Id.*

When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. *Hillabrand v. American Family Mut. Ins. Co., supra*; *Guerrier v. Mid-Century Ins. Co.*, 266 Neb. 150, 663 N.W.2d 131 (2003).

The instant case involves a guaranty, which is a type of contract by which a guarantor promises to make payment if the principal debtor defaults. See *780 L.L.C. v. DiPrima*, 9 Neb. App. 333, 611 N.W.2d 637 (2000), citing *Northern Bank v. Dowd*, 252 Neb. 352, 562 N.W.2d 378 (1997). A guaranty is interpreted using the same general rules as are used for other contracts. *780 L.L.C. v. DiPrima, supra*, citing *Spittler v. Nicola*, 239 Neb. 972, 479 N.W.2d 803 (1992).

Further, Nebraska adheres to the rule of strict construction of guaranty contracts. *Knox v. Cook*, 233 Neb. 387, 446 N.W.2d 1 (1989); *In re Estate of Fischer*, 227 Neb. 722, 419 N.W.2d 860 (1988). When the meaning of a guaranty is ascertained, or its terms are clearly defined, the liability of the guarantor is controlled absolutely by such meaning and limited to the precise terms. See *Knox v. Cook, supra*, quoting *Federal Deposit Ins. Corp. v. Heyne*, 227 Neb. 291, 417 N.W.2d 162 (1987). The Nebraska Supreme Court has also held that the liability of a guarantor is not to be enlarged beyond the strict terms of the contract. *In re Estate of Fischer, supra*; *Federal Deposit Ins. Corp. v. Heyne, supra*.

*Knox v. Cook, supra*, demonstrates that the terms of a guaranty agreement alone identify and determine the scope of liability under the guaranty. In *Knox*, the plaintiffs leased premises

for a term of 15 years to N Double C, Inc. The defendants were the sole shareholders of N Double C. The defendants had guaranteed rent under the lease by signing a guaranty which was attached to the lease. The lease provided that the defendants "'will guarantee the monthly payments as . . . set out [in the lease] until the property [t]herein described is re-leased or up to a term of thirty-six (36) months, whichever is sooner.'" *Id.* at 388, 446 N.W.2d at 2. The guaranty differently provided that "[i]n the event that [N Double C] should default under this lease agreement *at any time during its term*, the guarantors will guarantee the monthly payments set out in the original lease until the property is re-leased or up to a term of thirty-six (36) months, whichever is sooner." *Id.* at 389, 446 N.W.2d at 2 (emphasis supplied).

N Double C defaulted on the lease, and the plaintiffs brought suit against the defendants on the personal guaranty. The defendants contended that the language "'up to a term of thirty-six (36) months'" in the guaranty meant that the guaranty existed only for the first 36 months of the lease between the plaintiffs and N Double C, and not for 36 months after a default at any time during the lease term. *Id.* at 390, 446 N.W.2d at 3. The trial court concluded that the guaranty's language "'up to a term of thirty-six (36) months'" was ambiguous and allowed the defendants to testify concerning their intention for the guaranty. *Id.* At the conclusion of trial, the trial court concluded that the phrase "'up to a term of thirty-six months'" meant the 36 months starting at the beginning of the lease term and did not mean 36 months starting at any time that N Double C defaulted on the lease. *Id.* Since more than 3 years had elapsed from the beginning of the lease before the default, the trial court dismissed the action.

The Nebraska Supreme Court reversed. It held that the guaranty standing alone governed the scope of the guaranteed liability and that the language in the guaranty was unambiguous. It found that the guaranty's provision limiting the defendants' liability to "'a term of thirty-six (36) months'" clearly referred to the period of the defendants' liability after N Double C's default on the lease from the plaintiffs. *Id.* at 392, 446 N.W.2d at 4. The court found that while the defendants pointed out that

the lease provision regarding a guaranty did not include the language "'at any time during its term,'" it could not ignore that "the terms of the defendants' guaranty for performance of the lease, not the terms of the lease, identify and determine the scope of the defendants' personal liability under their guaranty." *Knox v. Cook*, 233 Neb. 387, 393, 446 N.W.2d 1, 5 (1989). The court further stated:

> "The debtor is not a party to the guaranty, and the guarantor is not a party to the principal obligation. The undertaking of the former is independent of the promise of the latter and the responsibilities which are imposed by the contract of guaranty differ from those created by the contract to which the guaranty is collateral."

*Id.*, quoting *National Bank of Commerce Trust & Sav. Assn. v. Katleman*, 201 Neb. 165, 266 N.W.2d 736 (1978).

Similarly, in *National Bank of Commerce Trust & Sav. Assn. v. Katleman, supra*, the defendants signed a commitment letter and guaranty agreement guaranteeing a loan extended by the plaintiff bank to Boetel & Co. and Boetel Properties, Inc. The plaintiff brought an action to enforce payment by the guarantors. The trial court instructed the jury that the contract between the plaintiff and the defendants consisted only of the commitment letter and the guaranty. The jury returned a verdict in favor of the defendants. The plaintiff argued on appeal that it was prejudicial error for the court to have excluded the loan agreement in the instruction of what constituted the contract between the parties. The Nebraska Supreme Court found that the evidence fully supported the instruction that the contract at issue was composed of the commitment letter and the guaranty agreement, because those were the only two documents signed by the defendants and they were aware only of the provisions of those documents. The court determined that the commitment letter and the guaranty agreement were the only two documents that composed the defendants' agreement with the plaintiff.

Based on *Knox v. Cook, supra*, and *National Bank of Commerce Trust & Sav. Assn. v. Katleman, supra*, the scope of Irwin's liability under the guaranty is determined solely by the terms of the guaranty. The guaranty is the only agreement signed by Irwin. Irwin is not a party to the lease between Eagle

Run and Lamar's. The undertaking of Irwin in the guaranty is independent of the undertaking of Eagle Run and Lamar's under the lease.

Applying the foregoing rules of construction or interpretation for a document, we conclude as a matter of law that the guaranty in the present case is unambiguous. The guaranty refers to "M & M Property Partners," and only "M & M Property Partners," as the "Owner." Given its plain meaning as an ordinary, average reasonable person would understand it, the phrase "M & M Property Partners" is not ambiguous, as it has only one reasonable meaning—an entity known as M & M Property Partners. The language in the first paragraph of the guaranty which states that it was made "[f]or the purpose of inducing M & M Property Partners, (herein called 'Owner')[,] to enter into a Lease" also only has one reasonable meaning, that being that M & M Property Partners was the owner entering into a lease with Lamar's, the tenant. Similarly, the concluding language that the guaranty "shall inure to the benefit of Owner" is clear that the guaranty inures to the benefit of M & M Property Partners. The language in the guaranty clearly sets forth that Irwin was guaranteeing a lease between M & M Property Partners and Lamar's, and not between Eagle Run and Lamar's. M & M Property Partners is the entity identified as the "Owner" that is entering into a lease with Lamar's, and it is the entity to which the guaranty runs.

Eagle Run argues that the phrase "TO: EAGLE RUN SQUARE II L.L.C." at the top of the guaranty, in conjunction with the use of the phrase "M & M Property Partners," creates ambiguity in that the two phrases are susceptible of two reasonable but conflicting meanings regarding to whom the guaranty runs. Eagle Run relies on *780 L.L.C. v. DiPrima*, 9 Neb. App. 333, 611 N.W.2d 637 (2000), in support of its argument. In *780 L.L.C.*, the plaintiff entered into a lease for commercial property with M.B.D. Midwest, Inc. A guaranty was also executed by the defendant, the president of M.B.D. Midwest. After M.B.D. Midwest defaulted on the lease, the plaintiff brought an action seeking to enforce the guaranty against the defendant. Trial was held, and extrinsic evidence regarding discussions that occurred prior to the execution of the guaranty was

admitted. The defendant took the position that he executed the guaranty in his capacity as president of M.B.D. Midwest and not personally, since when he executed the document entitled "'Personal Guarantee,'" he executed it by inserting "'Pres'" after his signature and wrote in the name and address of the corporation under his signature. *Id.* at 335-36, 611 N.W.2d at 641-42. After hearing the evidence, the trial court entered judgment in favor of the plaintiff.

On appeal, this court determined that the title on the guaranty was inconsistent with the manner in which the defendant signed the document and that the document was therefore ambiguous. We held that such an inconsistency regarding the capacity in which a defendant signs a guaranty creates an ambiguity which permits the admission of extrinsic evidence to explain the true intent of the parties.

However, the *780 L.L.C. v. DiPrima* case is distinguishable from the present case. The language "TO: EAGLE RUN SQUARE II L.L.C." does not create an inconsistency as to what entity is identified as the "Owner" in the guaranty agreement. There is no uncertainty that M & M Property Partners is the owner and no uncertainty that the guaranty inures to the benefit of M & M Property Partners. The "TO: EAGLE RUN SQUARE II L.L.C." language does not identify Eagle Run's role or how it ties into the guaranty. This is the only reference to Eagle Run in the entire document. Most importantly, the sole reference to Eagle Run does not refer to Eagle Run as owner or lessor. Such a reference could create an inconsistency within the guaranty, but such is not the case we are faced with. The guaranty is not inconsistent and, thus, not ambiguous regarding to whom the guaranty runs or who the "Owner" is.

Accordingly, we conclude that the trial court erred as a matter of law in determining that the guaranty was ambiguous. The terms of the guaranty are clear that M & M Property Partners is the owner identified in the guaranty, that Irwin was guaranteeing a lease between M & M Property Partners and Lamar's, and that the guaranty runs to the benefit of M & M Property Partners.

We further address what effect an assignment of rights by M & M Property Partners to Eagle Run has on Eagle Run's

ability to hold Irwin liable on the lease between Eagle Run and Lamar's. The record before us contains a document in which M & M Property Partners "assigns all of its right, title and interest that it has under the Lease Guaranty dated October 11, 1999," to Eagle Run. The guaranty allows for such an assignment within its terms. Specifically, it provides: "If any obligation or liability of [Lamar's] guaranteed hereby should be assigned by [M & M Property Partners], this Guaranty will inure to the benefit of [M & M Property Partners'] assignee to the extent of such assignment . . . ."

We conclude that the assignment is a nullity because M & M Property Partners had no rights to assign. Any rights that M & M Property Partners had to assign would stem from a lease between M & M Property Partners and Lamar's. There is nothing in the record to indicate that a lease between M & M Property Partners and Lamar's exists. M & M Property Partners has no interest to assign in the lease between Eagle Run and Lamar's. Thus, the assignment does not affect and is unrelated to the lease between Eagle Run and Lamar's. Accordingly, Eagle Run gets nothing from the assignment and the assignment does not affect Eagle Run's ability to hold Irwin liable on the lease between Eagle Run and Lamar's.

## CONCLUSION

We determine that the guaranty executed by Irwin was unambiguous as a matter of law. Therefore, we conclude that the trial court erred in overruling Irwin's motion for directed verdict on that basis. Accordingly, we reverse the order of the trial court denying Irwin's motion for directed verdict and remand the cause to the district court with directions to vacate the judgment entered upon the jury's verdict and to enter judgment granting Irwin's motion for directed verdict.

REVERSED AND REMANDED WITH DIRECTIONS.